UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| IMOGENE YARBROUGH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:15-CV-926-CEJ |
| ) | |
| KEITH D. WILKEY and ORTHOPEDIC ) | |
| ASSOCIATES, LLC, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on the joint motion of defendants Keith D. Wilkey, M.D., and Orthopedic Associates, LLC, for summary judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiff has responded in opposition and the issues are fully briefed.

### I. Background

Plaintiff Imogene Yarbrough brings this medical malpractice action against defendants Keith D. Wilkey, M.D. and Orthopedic Associates, LLC.[1] It is undisputed that plaintiff sought treatment from defendants for lower back pain and spinal stenosis with left leg radiculopathy (severe lower back and leg pain). Plaintiff underwent lumbar spine surgery at St. Clare Hospital on June 13, 2013, to treat these conditions.[2] While operating, Wilkey "inadvertently created a nick or tear in

---

[1] Plaintiff asserts liability for Orthopedic Associates under a theory of agency. Defendants do not dispute this theory of liability.
[2] The procedure involved "a left-sided partial laminectomy and foraminectomy at L3-4 and L4-5, partial bilateral laminectomy at L5-S1, partial foraminectomy left L3-4, L4-5 with

the dura, which is the outermost layer of membrane covering the spinal cord and nerve roots." *Id.* The parties agree that Wilkey then used sutures and DuraSeal[3] to repair the tear. Subsequent to the surgery plaintiff allegedly developed cauda equina syndrome. Plaintiff alleges that she suffered loss of bladder control, experienced "substantial increase in pain in her back and lower extremities," and "lost feeling in her buttocks and vaginal areas." *Id.* at 4.

Plaintiff asserts that her injuries resulted from the defendants' negligence. Specifically, plaintiff contends that defendants were negligent (1) in the application of DuraSeal to the dural tear and (2) in failing to perform post-operative diagnostic studies, such as an MRI or CT myelogram, after observing new symptoms prior to plaintiff's discharge on June 16, 2013. Plaintiff's sole expert witness, Robert Beatty, M.D., has opined that Wilkey failed to meet the standard of care in performing plaintiff's spinal surgery and addressing post-operative symptoms.

In their motion for summary judgment, defendants argue that plaintiff lacks sufficient evidence necessary to prove that their negligence was the but-for cause of plaintiff's injuries. They further contend that plaintiff has not established damages or provided admissible expert testimony.

## II. **Legal Standard**

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered if the moving party shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the

---

sublaminar decompression right L3-4, L4-5 and partial foraminectomy bilateral at L5-S1." [Doc. #26 at 1].

[3] DuraSeal consists of two solutions that "rapidly combine to form a sealant gel that seals the dura matter." [Doc. #26-7 at 103]. It prevents "cerebrospinal fluid leakage along dural sutures by forming a watertight closure." *Id.* at 104.

2

court is required to view the facts in the light most favorable to the non-moving party, giving that party the benefit of all reasonable inferences to be drawn from the underlying facts. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). If the moving party meets its burden, the non-moving party may not rest on the allegations of its pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012); *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853 (8th Cir. 2012). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Matsushita*, 475 U.S. at 587).

**III. Discussion**

**Medical Malpractice Standard**

Federal jurisdiction in this matter arises from diversity of citizenship. Accordingly, Missouri law applies. *See Hiatt v. Mazda Motor Corp.*, 75 F.3d 1252, 1255 (8th Cir. 1996); *Dugger v. United States*, 936 F. Supp. 662, 663 (E.D. Mo. 1996).

Under Missouri law, a plaintiff must prove three factors to establish a prima facie case of medical malpractice: (1) "an act or omission of the defendant failed to meet the requisite medical standard of care; (2) the act or omission was performed negligently; and (3) the act or omission caused the plaintiff's injury." *Mueller v.*

*Bauer*, 54 S.W.3d 652, 656 (Mo. Ct. App. 2001) (citing *Brickey v. Concerned Care of the Midwest, Inc.*, 988 S.W.2d 592, 596 (Mo. Ct. App. 1999)). Here, defendants argue that plaintiff has failed to establish a causal connection between Wilkey's alleged negligence and plaintiff's injuries.

"Usually, the test for a causal connection between a defendant's negligence and a plaintiff's injury is whether the evidence shows that the injury would not have been sustained but for the negligence." *Echard v. Barnes-Jewish Hosp.*, 98 S.W.3d 558, 566 (Mo. Ct. App. 2002). The defendant's negligence, however, need not be the sole cause, but can be "*a* cause or a contributing cause" of the plaintiff's injury. *Id.* at 567 (emphasis added). A prima facie showing of causation requires the plaintiff to show that defendant's "negligent conduct more probably than not was the cause of the injury." *Id.* (citing *Morrison v. St. Luke's Health Corp.*, 929 S.W.2d 898, 901 (Mo. Ct. App. 1992)).

In a complex medical malpractice cases—*i.e.*, one necessitating "surgical intervention or other highly scientific technique for diagnosis"—expert testimony is required to establish causation. *Nadolski v. Ahmed*, 142 S.W.3d 755, 761 (Mo. Ct. App. 2004) (internal quotations and citations omitted). When there are two or more possible causes, such expert testimony "must be given to a reasonable degree of certainty." *Coon v. Dryden*, 46 S.W.3d 81, 91 (Mo. Ct. App. 2001). "When an expert merely testifies that a given act or failure to act "might" or "could" have yielded a given result, though other causes are possible, such testimony is devoid of evidentiary value." *Id.* In other words, an expert's mere conjecture and speculation are insufficient to show causation. *Mueller v. Bauer*, 54 S.W.3d 652,

657 (Mo. Ct. App. 2001) (citing *Gaddy v. Skelly Oil Co.*, 259 S.W.2d 844, 853 (1953)).

### **Negligent Application of DuraSeal**

Plaintiff maintains that Wilkey improperly applied DuraSeal to repair the dural tear. According to plaintiff's expert, Wilkey employed DuraSeal in an enclosed space containing nerves rather than along the suture line (thereby violating the product's explicit warning). [Doc. #26-7 at 18, 30]. In support of this contention, Dr. Beatty relied on a July 18, 2014, CT scan revealing a mass in plaintiff's spine compressing the cauda equina. *Id.* at 20–24. On the basis of this scan, he also noted that Wilkey removed "very little bone" and "didn't remove the lamina"; therefore, when Wilkey managed the leak in the dura by syringe, he could have inadvertently used DuraSeal near "confined bony structures where nerves are present." *Id.* at 17–19, 21. Dr. Beatty concluded that it was more likely than not and within a reasonable degree of medical certainty that the DuraSeal caused plaintiff's cauda equina syndrome. *Id.* at 50.

Dr. Beatty gave the following relevant deposition testimony in response to defense counsel's questions:

> Q: Tell me why you felt that [the DuraSeal] [is] a key part of the case.
>
> A: Well, if you want to get into the thinking from the very beginning, the lady has the cauda equina syndrome right after the surgery. Within [a] day or two, she's got 900 cc's of residual urine. She can't feel her stool pass eventually. So there's no question she has this.
> And looking at the CT scan that she had a year later, she has a mass in the spinal canal . . . What it is, I don't know. It may well be organized material that's product simulated. I don't know. But there's a lump there and we can look at the films eventually here.

5

> Q: Okay.
>
> A: But the point is that when I looked at this, I wasn't sure what it was. And then I thought about the DuraSeal and if you read the literature on it, it is - - there's a warning not to use it in an enclosed space where there are nerves.
>
> And I went through these films again. He's removed very little bone and then he's encountered a leak in the dura . . . So something is occupying space. He says he sewed up the little dura - - the hole in the dura and then he put in this material which swells. According to this it's cautioned that you don't put it into an enclosed space.

*Id.* at 17–18.

> Q: So it's your opinion to a reasonable degree of medical certainty that the DuraSeal caused cauda equina for Ms. Yarbrough?
>
> A: Yeah, right, right. And in the presence of not removing -- putting it into an enclosed space and in the presence of a -- of a hole in the dura.

*Id.* at 50.

Defendants contend that Dr. Beatty provides inadequate evidence as to (1) how Wilkey applied DuraSeal during plaintiff's surgery, (2) the nature of the mass on the CT scan, (3) whether this mass existed immediately after the surgery or while plaintiff was under Wilkey's care, (4) whether this mass could be DuraSeal, which generally absorbs into the body within eight weeks, and (5) whether DuraSeal stimulated a tissue response that produced this mass. [Doc. #25 at 7–9; Doc. #30 at 2]. Defendants further argue that Dr. Beatty's use of the words "probably" and "gut feeling" demonstrate that plaintiff has not made out a prima facie case of medical malpractice. [Doc. #25 at 6–7]. Finally, defendants note that the neurosurgeon that ordered plaintiff's July 2014 CT scan did not share Dr.

Beatty's diagnoses. Each of these issues, according to defendants, shows that Dr. Beatty's "opinion about the cause of [plaintiff's cauda equina syndrome] is based on speculation and is unsupported by facts" and therefore "devoid of evidentiary value." *Id.* at 8.

The Court finds that there are genuine issues of material fact regarding a possible "causal connection between [the] procedure[] and the injury sustained by plaintiff." *Zimmer v. United States*, 702 F. Supp. 757, 761 (E.D. Mo. 1988). Dr. Beatty affirmatively responded when asked whether Wilkey's negligence caused plaintiff's injury within "a reasonable degree of medical certainty." *See Sundermeyer v. SSM Reg'l Health Serv.*, 271 S.W.3d 552, 556 (Mo. 2008) (en banc) (holding that an expert's affirmative answer regarding whether his testimony was given to a reasonable degree of medical certainty sufficed to establish causation "for purposes of analyzing the propriety of summary judgment"). Dr. Beatty's affirmative response and medical explanations are not undermined by his use of "probably" or "gut feeling." *See Yoos v. Jewish Hosp. of St. Louis*, 645 S.W.2d 177, 187 (Mo. Ct. App. 1982) (holding that an expert's use of "feeling," "probably," "very likely," "possibly," "thinks," and "believes," did not render his statements speculative in light of the totality of his testimony, but instead served as "expression[s] of his expert opinion and judgment as to the cause of plaintiff's injury"); *Davolt v. Highland*, 119 S.W.3d 118, 125–26 (Mo. Ct. App. 2003) (holding that absolute certainty was not required to establish causation where an attempted spinal cord decompression did not resolve plaintiff's symptoms); *cf. Super v. White*, 18 S.W.3d 511, 516–18 (Mo. Ct. App. 2000). Viewed as a whole, Dr. Beatty provided his opinion to a reasonable degree of certainty. *See Nadolski v. Ahmed*,

7

142 S.W.3d 755, 761 (Mo. Ct. App. 2004). Furthermore, Dr. Beatty's testimony did not simply speculate. He relied on a myelogram and lumbar CT scan, a pre-operative MRI, records from urologist, Dr. Vulin, and his diagnosis of a neurogenic bladder, defendant Wilkey's records, and St. Clare Hospital records. *See Sundermeyer*, 271 S.W.3d at 555 (denying summary judgment and finding an expert's testimony not speculative because it relied on medical records, photographs, and other depositions).

Additionally, defendants conflate "the distinction between admissibility of expert opinion and the submissibility of a plaintiff's case in reliance thereon." *Sanders v. Ahmed*, 364 S.W.3d 195, 208 (Mo. 2012) (en banc). "If a question exists as to whether the proffered opinion testimony of an expert is supported by a sufficient factual or scientific foundation, the question is one of admissibility." *Id.* at 208–09 (quoting *Washington v. Barnes* Hospital, 897 S.W.2d 611, 616 (Mo. 1995) (en banc)). Here, in large part defendants challenge the "scientific or factual foundation" of Dr. Beatty's opinion. *See id.* at 209. But what matters for the purposes of this motion is that Dr. Beatty relied on medical records and not mere conjecture to offer an opinion within a reasonable degree of medical certainty. Accordingly, giving plaintiff the benefit of all reasonable inferences to be drawn from the underlying facts, summary judgment is not appropriate on this ground.

### **Failure to Conduct Post-Operative Diagnostic Testing**

Plaintiff also claims that defendant Wilkey failed to "exhaust diagnostic testing" "in the face of new, immediate neurologic complaints and deficits." [Doc. #12-1 at 1]. According to plaintiff, this alleged failure "directly caused or directly contributed" to plaintiff's injuries. [Doc. #26 at 2]. Dr. Beatty opined that "[t]he

8

standard of care is [that] new neurological symptoms demand an aggressive diagnostic work-up," which would include an MRI or CT myelogram, as well as an evaluation of rectal tone and perianal sensation with a pin. [Doc. #26-7 at 25, 32, 42–43]. He further observed that certain red flags should have signaled the necessity of such tests. *Id.* at 43–44. For example, St. Clare Hospital records from the first day post-operation indicated that plaintiff had perianal numbness. *Id.* at 34. The following day's records show "urinary retention, 999 milliliters, numb rectum and vagina," and that plaintiff went "home with a catheter." *Id.* The second day signals, according to Dr. Beatty, distinguished new symptoms from preexisting urologic issues. *Id.* at 38.

Missing these signals was critical, as Dr. Beatty characterized the time shortly following the surgery as a "golden time"; it was the crucial juncture to remove the mass compressing the cauda equina "since it does expand and in an enclosed space can press and cause exactly what they [the manufacturers of DuraSeal] are warning about." *Id.* at 24. He added that if Dr. Wilkey had performed these post-operative diagnostic steps "there's a possibility" that he would have discovered "something treatable." *Id.* at 48–49.

Specifically, Dr. Beatty offered the following opinions:

> A:   Okay. So you believe the standard of care required an MRI or a myelogram on June 15th, 2013, but you don't know what it would have shown, correct?
>
> A:   No.
>
> Q:   That's correct?
>
> A:   That's correct.

9

> Q: Okay. And you don't know if it would have shown anything treatable, correct?
>
> A: That's correct.
>
> Q: And even if there had been a compression with DuraSeal, you don't know whether removal of that compression would have resolved her complaints or treated the problem, correct?
>
> A: I don't know that it would resolve it, but I think she would be - - more likely than not, she would have improved and not be in the situation that she is now.

[Doc. #26-7 at 65–66].

Defendants argue that Dr. Beatty's opinion on causation is speculative with regard to Wilkey's alleged failure to exhaust diagnostic testing. Defendants specifically claim that (1) Dr. Beatty did not know if a rectal and perianal sensation exam was performed, (2) Dr. Beatty did not know whether a post-operative neurological examination was performed, (3) plaintiff had a history of "bladder issues," and (4) Dr. Beatty could not definitively state that a MRI or CT myelogram would have revealed any treatable condition. [Doc. #25 at 12–13].

The Court agrees that plaintiff has failed to establish a causal connection between failure to conduct diagnostic testing and plaintiff's purported cauda equina syndrome. Dr. Beatty merely conjectured and could not conclude within a reasonable degree of medical certainty that failure to run these tests directly caused or contributed to the injury. Although Dr. Beatty stated that it was "more likely than not" that plaintiff "would have improved," he could not say what the results of those tests would have revealed, what treatment would have been

administered, and if any of those treatments would have remedied her condition.[4] *Cf. Baker v. Guzon*, 950 S.W.2d 635, 638 (Mo. Ct. App. 1997) (where experts testified that prompt diagnosis and administration of antibiotics would have provided a seventy-percent chance of survival to deceased plaintiff). Moreover, this case is analogous to *Mueller v. Bauer*, where plaintiff's expert acknowledged he had to speculate due to lack of documentation. *Mueller*, 54 S.W.3d 652, 655 (Mo. Ct. App. 2001). Here, Dr. Beatty stated "[s]ince we didn't do the studies . . . [w]e don't know if it was treatable or not treatable." [Doc. #26-7 at 58]. Accordingly, with regard to diagnostic testing, the plaintiff has "failed to present expert testimony to show" that her condition "would not have occurred but for the defendant's negligence." *Nadolski v. Ahmed*, 142 S.W.3d 755, 761 (Mo. Ct. App. 2004).

The defendants are entitled to summary judgment on the claim of negligence based on failure to conduct post-operative diagnostic testing.

**Damages**

Defendants argue that Dr. Beatty did not provide any pertinent testimony about damages. [Doc. #25 at 13]. Plaintiff is not required to prove damages as part of her prima facie case of medical malpractice. *See Mueller v. Bauer*, 54 S.W.3d 652, 656 (Mo. Ct. App. 2001). It is unclear whether defendants attempt to dispute plaintiff's injury in their summary judgment motion, but regardless, they have not presented sufficient evidence to merit summary judgment on this basis.

\* \* \*

For the reasons set forth above,

---

[4] Defendants arguments about plaintiff's knowledge of the facts (regarding imaging) are factual questions, and are not relevant to the issue of whether judgment as a matter of law is warranted.

**IT IS HEREBY ORDERED** that the motion of defendants for summary judgment [Doc. #25] is **granted** with respect to the claim that defendants negligently failed to perform post-operative diagnostic testing. The motion is **denied** in all other respects.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 15th day of December, 2016.